**SO ORDERED.**

**SIGNED this 22 day of January, 2010.**

**J. Rich Leonard**
**United States Bankruptcy Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

**IN RE:** **CASE NO.**

**D&B SWINE FARMS, INC.,** **09-02813-8-JRL**

**Debtor.**

**D&B SWINE FARMS, INC.,**

**Plaintiff,**

**v.**

**MURPHY-BROWN, L.L.C., and**
**SMITHFIELD FOODS, INC.,**

**Defendants.**

**ADVERSARY PROCEEDING**
**Case No. 09-00160-8-JRL**

**ORDER REGARDING MOTION TO DISMISS**
**AND DENYING MOTION TO COMPEL ARBITRATION**

The matters before the court are the defendants' motion to dismiss Smithfield Foods, Inc. from the complaint, and to compel arbitration and to dismiss or, alternatively, to stay the adversary proceeding during arbitration. A hearing took place in Raleigh, North Carolina on December 3, 2009.

FACTUAL BACKGROUND

Plaintiff D&B Swine Farms, Inc. ("D&B") filed a petition under chapter 12 of the Bankruptcy Code on April 6, 2009. The case subsequently was converted to a case under chapter 11.

Prior to filing its bankruptcy petition, D&B was a farrow-to-finish swine farm operation in Eastern North Carolina with an animal population of approximately 1200 sows. D&B did not itself own the animals it raised, and instead provided nursery, growing, and finishing services for other businesses.

On June 14, 1999, D&B entered into a Swine Production Agreement with Dogwood Farms II, LLC ("Dogwood Farms"), whereby the parties agreed that D&B would breed, grow, and care for a group of breeding swine and their offspring for compensation determined according to a payment schedule. The assets of Dogwood Farms subsequently were acquired by Premium Standard Farms of North Carolina, Inc. ("PSF NC"). That acquisition began a series of ownership changes relevant to Smithfield's motion to dismiss.

On September 4, 2001, D&B entered an agreement with PSF NC for nursery services (the "Nursery Agreement"). On July 25, 2002, PSF NC and D&B entered into an Amended and Restated Sow Contract Grower agreement (the "Sow Agreement"). Both the Nursery Agreement and the Sow Agreement include arbitration provisions. A third agreement between D&B and PSF NC, which the parties refer to as the "Finishing Agreement," was not written and is not the subject of the motion to arbitrate. Pursuant to the Finishing Agreement and beginning in or around late 2001 or early 2002, D&B undertook to grow the weaned pigs to a weight acceptable for market sale. The original compensation structure between D&B and PSF NC became unwieldy, so the parties

amended the Finishing Agreement to establish what effectively became a month-to-month lease of D&B's finishing floors at a rate of $14,000 per month.

PSF NC was a subsidiary of Premium Standard Farms, Inc. ("PSF, Inc."), which owned all the outstanding shares of stock of PSF NC. On May 9, 2005, PSF NC merged with and into PSF, Inc. Defs.' Mem. Ex. 1. PSF, Inc. was the surviving entity of that merger. Next, PSF, Inc. was merged into New PSF, LLC on August 2, 2007. The certificate of merger designates New PSF, LLC as the surviving LLC and states its new name as Premium Standard Farms, LLC ("PSF, LLC"). Paragraph 6 of the certificate provides that "[t]he Agreement and Plan of Merger is on file at 200 Commerce Street, Smithfield, Virginia 23431, the place of business of the surviving limited liability company." Defs.' Mem. Ex. 2. That address also is the address of Smithfield Foods, Inc. ("Smithfield") as it appears on the letter attached to the plaintiff's complaint as Exhibit J. The certificate of merger between PSF, Inc. and New PSF, LLC was signed by Craig A. A. Dixon in his capacity as Assistant Secretary of New PSF, LLC. Defs.' Mem. Ex. 2. Mr. Dixon also appears to be the Assistant Vice President, Senior Counsel and Assistant Secretary of Smithfield. Compl. Ex. J.

A new Delaware limited liability company, M-B Farms Sub, LLC ("M-B Farms") was formed on July 20, 2007. The defendants state that PSF, LLC was the sole member of M-B Farms. Defs.' Mem. at p. 5 ¶ 5. On August 17, 2007, PSF, LLC transferred its rights under the three agreements to M-B Farms in a Bill of Sale and Assignment Agreement, which was executed by Mr. Dixon as Assistant Secretary of both M-B Farms and PSF, LLC. Defs.' Mem. Ex. 4.

On January 2, 2008, M-B Farms merged with and into Murphy-Brown, LLC, with Murphy-Brown being the surviving entity. As before, the certificate of merger provides that the agreement

and plan of merger is on file at the surviving limited liability company's (*i.e*. Murphy-Brown's) place of business, which is located at Smithfield's business address in Smithfield, Virginia. Defs.' Mem. Ex. 5. The certificate is signed by Mr. Dixon in his capacity as Assistant Secretary of Murphy-Brown, LLC.

Ownership interests aside, the relationship between D&B and, ultimately, Murphy-Brown was interrupted in February of 2009. On February 12, 2009, D&B received a notice of termination which provided that Murphy-Brown was terminating the Sow Agreement due to D&B's "repeated and ongoing failure to meet its obligations." Compl. ¶¶ 24-25. The letter stated further that "all [Murphy-Brown] owned swine, feed and other supplies will be removed from [D&B's] property through a timely depopulation of [D&B's] farm. [D&B's] cooperation during the conclusion of our business relationship is greatly appreciated and will ensure the prompt payment of any amounts owing to D&B as of the Termination Date." Defs.' Mem. Ex. H. This representation, according to plaintiff D&B, constituted an unequivocal notice of defendants' intent to no longer honor the terms of the Nursery and Finishing Agreements. Compl. ¶¶ 37, 41. D&B responded through counsel and claimed contractual entitlement to a ten-day cure period. Murphy-Brown's response to that letter was issued by Mr. Craig on Smithfield letterhead. The response stated that the problems with D&B's performance were longstanding and that D&B already had used its cure period pursuant to an agreement dated February 5, 2008. Mr. Craig wrote that Murphy-Brown had no choice but to terminate the Sow Agreement.

D&B filed a petition under chapter 12 on April 6, 2009. At that time, according to the complaint, D&B still had approximately 1200 sows on site. Compl. ¶ 7. The complaint alleges that Murphy-Brown and the debtor agreed to a depopulation plan after D&B filed a petition under

chapter 12. Compl. ¶ 29. The animals were removed from D&B's farm in May of 2009 pursuant to a depopulation plan. Murphy-Brown did not file a claim in the debtor's bankruptcy case, so the debtor's complaint against Murphy-Brown is not a counterclaim.

## DISCUSSION

**Motion to Dismiss Smithfield as A Party**

Smithfield contends that it should be dismissed from the adversary proceeding because it was not a party to the contracts at issue and does not otherwise have an ownership interest that could subject it to liability for the breach and unlawful termination of contract claims. D&B counters that the motion to dismiss is premature. Smithfield acted as Murphy-Brown's attorney in this matter, D&B asserts, and both Murphy-Brown and Smithfield assumed the rights and responsibilities under the contracts. Compl. ¶ 18. Smithfield also interacted with the plaintiff during the course of D&B's performance of the contracts. D&B contends that inquiry, through discovery, into the details of ownership and control as between Smithfield, Murphy-Brown and the related entities that preceded Murphy-Brown will further establish that Smithfield is a proper party to this action, including the claims for breach of contract and unfair and deceptive trade practices.

The motion to dismiss, because it is supported by matters outside the pleadings, is more properly addressed as a motion for summary judgment under Rule 56 of the Federal Rules of Bankruptcy Procedure, made applicable by Federal Rule of Bankruptcy Practice 7056. Fed. R. Civ. P. 12(d), made applicable by Fed. R. Bankr. P. 7012. The defendants' memorandum includes exhibits which, in Smithfield's view, clarify the ownership interests of the entities who took over the D&B contracts and show that Smithfield did not assume the rights and obligations of PSF NC or any of the other subsequent holders of those rights and interests. The plaintiff will have twenty

days to respond to the motion to dismiss as a motion for summary judgment, or to request additional time in which to respond. Fed. R. Civ. P. 56(f), made applicable in bankruptcy by Fed. R. Bankr. P. 7056.

**Motion to Compel Arbitration and to Dismiss or Stay Adversary Proceeding**

The defendants also move to compel arbitration and to dismiss or alternatively to stay the adversary proceeding based on arbitration provisions in the Sow and Nursery Agreements. Both of these contracts are written and include arbitration clauses. The Finishing Agreement, the parties agree, was both unwritten and more akin to a monthly lease, and there is no arbitration provision in connection with that agreement.

The defendants argue that the contract claims are for pre-petition breaches and, as such, are non-core and should be submitted to arbitration. See In re Apex Express Corp., 190 F.3d 624, 632 (4th Cir. 1999) (resolution of a pre-petition contract based claim was a "private right dispute" and thus "hardly at the core of restructuring debtor-creditor relationships"). Arbitration provisions generally are favored in federal courts. In bankruptcy proceedings, however, whether a proceeding is a "core proceeding" as defined by 28 U.S.C. § 157(b) generally determines whether an arbitration clause can be enforced. See White Mountain Mining Co., 403 F.3d 164, 168-70 (4th Cir. 2005); Blanchard Transportation, 2008 WL 619379 at *1 (Bankr. E.D.N.C. 2008). The Fourth Circuit concluded in White Mountain that "[a]rbitration is inconsistent with centralized decision-making because permitting an arbitrator to decide a core issue would make debtor-creditor rights 'contingent upon an arbitrator's ruling' rather than the ruling of the bankruptcy judge assigned to hear the debtor's case." White Mountain, 403 F.3d at 169 (internal citation omitted).

Under the test established in Shearson/Am. Express Inc. v. McMahon, 482 U.S. 220, 226, 107 S. Ct. 2332 (1987), "the burden is on the party opposing arbitration to show that Congress intended to 'limit or prohibit waiver of a judicial forum for a particular claim' under the Federal Arbitration Act." Blanchard Transportation, 2008 WL 619379 at *1 (quoting McMahon). D&B argues that this court's analysis should focus on the legal effect of what it characterizes as the defendants' unilateral breach of the Sow Agreement and accompanying unilateral, unequivocal and anticipatory breaches of the Nursery and Finishing Agreements. First, D&B claims that the anticipatory breach operated to release D&B from the Nursery Agreement's terms, including the arbitration provision. Pl.'s Mem. at p. 5. Alternatively, D&B argues, the court should construe the ultimate termination of the written Nursery Agreement and the unwritten Finishing Agreement as *post*-petition breaches that occurred in May of 2009, when the animals were removed from the farm. If those agreements were the subject of post-petition rather than pre-petition breaches, D&B reasons, then the breaches arose in the proceeding and on that basis qualify as core matters within the jurisdiction of this court.

The complaint asserts, in Claim One, the wrongful termination of the Sow Agreement effected by letter dated February 9, 2009. Claim Two is for breach and anticipatory repudiation of the Nursery Agreement, and Claim Three is for breach and anticipatory repudiation of the Finishing Agreement. The breaches alleged in Claims Two and Three were allegedly effected by the letter dated February 9, 2009 or, alternatively, occurred when the farm was depopulated in May of 2009.

As to D&B's first argument, the court cannot agree that Murphy-Brown's "voluntary and unilateral" termination of the Sow Agreement releases the estate from the arbitration provision in that contract. Even assuming Murphy-Brown's termination of the agreement was done without

sufficient notice and otherwise constitutes a breach, the import of that would not be to negate the arbitration clause. The arbitration clause is not invalid for that reason and the claim is for a pre-petition breach of contract, so it appears at first pass that the claim should be submitted to arbitration. Next, D&B argues that the Nursery Agreement and Finishing Agreement rode through the bankruptcy. Not until the defendants asked for the stay to be lifted, and removed the weaned pigs and finished animals from the farm during the chapter 12 proceeding, D&B reasons, did the defendants breach the Nursery and Finishing Agreements. This interpretation appears at first glance to be at odds with the alleged anticipatory repudiation of those two agreements, but North Carolina law recognizes this scenario: In this context, the non-breaching party has the authority to determine the precise time of breach through its decision to stop performance upon anticipatory repudiation, or to continue to perform under the contract. Thus, D&B contends that:

> First, pursuant to North Carolina law, at the time the notice of termination and depopulation plan was sent, Plaintiff could either interpret this act as an immediate breach of the Swine Production Agreement and suspend performance, or continue performance under the Agreements' terms and reserve its rights thereunder. Here, the Plaintiff continued to perform until Murphy-Brown filed its motion for relief from the automatic stay and recovered the animal inventory. Therefore, at least as concerns the [Nursery] and Finishing Agreements, termination did not occur until after the bankruptcy petition was filed.

Pl.'s Mem. at 6. This is D&B's most persuasive argument.

Under North Carolina law, in the context of an anticipatory breach, the non-breaching party's choice to suspend performance or to continue to perform may fix the actual date of breach. The North Carolina Supreme Court stated in an early decision: "It may be observed, however, that the renunciation itself does not *ipso facto* constitute a breach. It is not a breach of the contract unless it is treated as such by the adverse party." Edwards v. Proctor, 173 N.C. 41, 44, 92 S.E. 584, 585 (1917), quoted in Gordon v. Howard, 94 N.C. App. 149, 153, 379 S.E.2d 674, 676 (1989); see also

Strategic Outsourcing, Inc. v. Continental Casualty Co., 414 F. Supp. 2d 545, 550-51 (W.D.N.C. 2006), aff'd in relevant part, 274 Fed. Appx. 228, 232 (4th Cir. 2008) ("North Carolina courts have recognized that a repudiation, or anticipatory breach, constitutes an actual breach of contract that triggers the statute of limitations *if* the injured party treats the repudiation as a breach.").

According to D&B, then, its election to continue to perform under all three agreements until the animals were removed under the Depopulation Plan fixes the time of the actual breach of at least the Nursery and Finishing Agreements at some point in May, when the depopulation took place. A breach of contract that occurs after the petition is filed arises in the case, D&B argues, and thus constitutes a core dispute under 28 U.S.C. § 157(b). Unfortunately, the question of whether a post-petition breach of a pre-petition contract constitutes a "core" matter is unsettled.

The White Mountain court did not consider that exact question but it was front and center in In re United States Lines, Inc., 197 F.3d 631 (2nd Cir. 1991), which is the opinion to which the Fourth Circuit frequently referred in White Mountain. The Court of Appeals for the Second Circuit held, in United States Lines, that the "critical question in determining whether a contractual dispute is core by virtue of timing is not whether the *cause of action* accrued post-petition, but whether the *contract* was formed post-petition." 197 F.3d at 637. However, the United States Lines court did not hold that contractual disputes involving post-petition breaches of pre-petition contracts cannot be core. Instead, it explained, the relevant inquiry is "the impact these contracts have on other core bankruptcy functions." Assessment of that impact can, when assessing whether arbitration interferes with bankruptcy courts' jurisdiction and ability to fulfill the underlying purposes of bankruptcy law, become an extremely circular exercise because post-petition breaches of contracts made pre-petition frequently do impact core bankruptcy functions to the extent that the contract claims are core.

Concurring in United States Lines, Judge Newman expressed his view that "the efficient functioning of the bankruptcy system will be better served by a bright-line rule that treats as core proceedings all suits alleging post-petition breaches of pre-petition contracts." 197 F.3d at 641 (Newman, J., concurring). "Since a cause of action for a post-petition breach *can* constitutionally be considered core," Judge Newman reasoned, "it always should be in order to promote the efficient functioning of the bankruptcy system." 197 F.3d at 642-43. There are solid arguments on both sides, but this court agrees that the bright-line rule Judge Newman suggested would be extremely useful. At present, as recent cases attest, there is no clear consensus. See Philadelphia Newspapers, LLC v. Review Publishing, L.P. (In re Philadelphia Newspapers, LLC), 2009 WL 5178333 (Bankr. E.D. Pa. 2009) (observing that whether claims for post-petition breaches of contract are core proceedings is "not so clear cut" and reviewing "divergent results" reached by courts that have addressed the issue); SAI Administrative Claim and Creditor Trust v. Benecke-Kaliko AG (In re SAI Holdings Ltd.), 2009 WL 1616663 at *7 (Bankr. N.D. Ohio 2009) (noting that there is "no clear consensus regarding the nature of a proceeding that involves postpetition breaches of a prepetition contract, some courts finding such contract disputes to be core while other courts find them to be non-core proceedings").

In this case, after full review, the court concludes that the alleged post-petition breaches of the Nursery and Finishing Agreements are core matters within the jurisdiction of this court. It is significant that any monies the debtor may recover in the proceeding are not only assets of the chapter 11 estate, they also are the *only* assets of the estate. The amounts D&B seeks to recover for post-petition breaches were not available before the petition was filed, and as such are an integral part of this proceeding. Accordingly, the arbitration provision in the Nursery Agreement will not

be enforced. Ordering arbitration and staying the adversary proceeding would substantially interfere with D&B's efforts to reorganize, which evidences an inherent conflict between arbitration and the underlying purpose of the bankruptcy laws. See White Mountain, 403 F.3d at 169.

Whether the Finishing Agreement is subject to arbitration was not an issue. The agreement is an unwritten month-to-month lease arrangement, and the extent to which it could be breached by an anticipatory repudiation is unclear, but in any event the plaintiff elected to continue to perform until Murphy-Brown ceased to pay for the monthly services and took possession of the stock. At this juncture, these facts are sufficient to support the claim for breach and anticipatory repudiation and to withstand the motion to dismiss.

Returning to the Sow Agreement, it is clear that arbitrating that claim, while resolving the related core claims in the adversary proceeding, would be completely untenable. The "very purpose of bankruptcy is to modify the rights of debtors and creditors, . . . and Congress intended to centralize disputes about a debtor's assets and legal obligations in the bankruptcy courts." White Mountain, 403 F.3d at 169 (internal quotations omitted). The White Mountain court repeatedly emphasized the goal of "centralization" and the avoidance of "piecemeal litigation," especially in the context of chapter 11 cases. The "fundamental purpose" of that chapter is to "'centralize all disputes concerning [a debtor's legal obligations] so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.'" White Mountain, 403 F.3d at 170, quoting In re Ionosphere Clubs, Inc., 922 F.2d 984, 989 (2nd Cir. 1990).

To bifurcate the adversary proceeding by allowing arbitration of the Sow Agreement would entirely defeat the objective of centrality. It also would 1) create the potential for inconsistent results; 2) interfere with this court's efficient administration of the estate; 3) impose additional,

unnecessary litigation costs on the estate; and 4) divert the debtor's management's attention and time from the debtor's operations (the debtor is operated by a husband and wife). If the other claims were not properly before this court, and if the conflicts just outlined could be avoided, then the court would enforce the arbitration clause notwithstanding this court's usual misgivings about the use of arbitration in chapter 11 bankruptcy cases. In this case, the court cannot do so, because it would run exactly counter to the primary goal of a chapter 11 proceeding, which is to efficiently rehabilitate the debtor.

For the foregoing reasons, the plaintiff will have twenty days to respond to the motion to dismiss Smithfield as a party to this adversary proceeding as a motion for summary judgment, or to request additional time in which to respond. The motion to compel arbitration or alternatively to dismiss is denied.

**END OF DOCUMENT**